FAYETTE R. PLUMB, INC., v. PHARR.

Opinion delivered June 13, 1927.

1. BILLS AND NOTES—RENEWAL NOTES.—In an action on notes secured by a vendor's lien against timber, evidence *held* to support a finding that new unsecured notes were not given in satisfaction of the original secured notes, where the original notes were not taken up.

2. BILLS AND NOTES—RENEWAL NOTES.—Without an agreement to that effect, the renewal of a note will not operate as a payment of an original note.

3. ESTOPPEL—VENDOR'S LIEN.—The payee of a note secured by a vendor's lien on timber is not estopped from setting up its claim against the purchaser's grantee, by allowing timber to be removed without objection, where the timber deed was recorded, since leniency on a part of the vendor in collecting the purchase money cannot relieve the purchaser or his grantee removing the timber from paying for it.

4. LOGS AND LOGGING—VALUE OF TIMBER REMOVED.—In an action on notes secured by vendor's lien on timber, evidence *held* sufficient to support a finding that defendant, who was the purchaser's grantee, had removed timber exceeding $4,000 in value.

Appeal from Prairie Chancery Court, Northern District; *J. S. Gatewood*, Special Chancellor; affirmed.

*Bogle & Sharp,* for appellant.

*Emmet Vaughan,* for appellee.

HUMPHREYS, J.    This suit was instituted on the 8th day of June, 1922, in the chancery court of Prairie County against H. C. Argo, Bank of Brinkley, Fayette R. Plumb, Inc., and D. H. Echols as receiver for H. A. Daggett & Company, to recover $4,000 and interest on two promissory notes evidencing the purchase money for the timber on 2,300 acres of land in Prairie and Woodruff counties, particularly described in the complaint, which timber they sold to H. C. Argo on the 8th day of October, 1919; and to enforce a vendor's lien against such of the timber as had not been removed when the suit was brought, which lien they reserved in the timber deed they executed to H. C. Argo.    It was alleged in the complaint that H. C. Argo sold said timber to H. A. Daggett & Company, and that H. A. Daggett & Company sold the timber

on said tract and on another tract of about the same acreage to appellant, Fayette R. Plumb, Inc., for $15,000; that appellants had removed large quantities of timber from the land without paying the notes, not leaving sufficient timber in value to pay same.

The Bank of Brinkley had no interest in the suit further than that the said Daggett & Company had given them a lien on the timber to secure a note. H. C. Argo filed no answer. D. H. Echols, as receiver for H. A. Daggett & Company, filed an answer, and denied liability, and pleaded payment of the notes sued on; and appellant, Fayette R. Plumb, Inc., filed an answer, in which it denied all liability, and pleaded payment of the notes. The latter-named appellant is the only one who made any defense to the action. H. C. Argo and H. A. Daggett & Company are, and were, insolvent on the date of the filing of the suit.

The cause was submitted upon the pleadings and testimony adduced by the respective parties, which resulted in a finding by the court that H. C. Argo and H. A. Daggett & Company were insolvent, and that appellant, Fayette R. Plumb, Inc., had removed timber exceeding in value the amount sued for, and were liable to appellees to the amount of their claim in the sum of $4,000, with interest thereon at the rate of 6 per cent. per annum from the 8th day of October, 1919, to the date of the trial; and a consequent judgment in favor of appellees against appellant, Fayette R. Plumb, Inc., in the total sum of $5,577.33, from which is this appeal.

Appellant first contends for a reversal of the decree on the alleged ground that, according to the undisputed testimony, the lien notes executed by Argo to appellees for the timber were paid and the lien extinguished by their acceptance of the notes from him secured by other collateral. The testimony referred to and relied upon by them to sustain this contention consists of a letter written to H. C. Argo by W. R. Pharr on June 8, 1921, acknowledging the receipt of the $4,000 note and four hundred shares of H. A. Daggett Company stock, together

with Argo's statement that the stock had a par value of
$10,000 at the time it was placed as security to Pharr;
and the two following excerpts from the testimony of
Mr. Argo:

"At the request of W. R. Pharr my personal notes
were given without security in satisfaction and in lieu·
of the lien notes referred to, and, as nearly as I can recall,
the transaction occurred shortly after the maturity of the
lien notes, as, according to Mr. Pharr, the personal notes
were wanted in order to substitute them for the lien
notes."

"I do not remember the date of the unsecured notes.
They were mailed to W. R. Pharr at Memphis, Tennessee.
Upon arriving at the conclusion later that my financial
responsibility was insufficient to afford security for pay-
ment of the substituted personal notes, I voluntarily gave
W. R. Pharr all the shares of stock representing my inter-
est in the H. A. Daggett Company. This was accepted
by him and understood at the time as being ample
security."

We think learned counsel are mistaken in concluding
that the testimony of Mr. Argo stands in the record undis-
puted, to the effect that he paid the notes sued upon by
giving his personal note in lieu of said lien notes. It is
reflected by the record that the notes sued upon, or lien
notes, were never surrendered by W. R. Pharr to Mr.
Argo in exchange for his personal note with new collat-
eral attached. W. R. Pharr testified in substance that
the original notes were never paid or intended to be paid·
by the subsequent notes given to him by H. C. Argo; that
the subsequent notes were renewal notes given him by
Pharr so that he might pledge them from time to time to
his banker as collateral; that they were merely accommo-
dation paper, because he could not pledge past due paper
to the bank as collateral; that, after he had used the
renewal notes from time to time, the bank refused to take
them, and W. R. Pharr attached the H. A. Daggett &
Company stock as collateral so that he could use same
with his banker; that, soon after the stock was attached,
it was ascertained that it was worthless, and he was

unable to use the renewal notes as collateral security with his banker. The following questions and answers appear in the testimony of W. R. Pharr:

"Q. Have you ever hypothecated it? (Referring to the first renewal note). A. Yes, I used it as collateral from time to time. As the notes would fall due and payments were not paid, they would have to be renewed, and when the note would fall due it would have to be returned, and Argo would send me a new note for 90 days, and from time to time that one would be renewed, but never was there a payment made, and they were renewed so many times and I had so many notes that one of them got misplaced. Neither of the notes, principal or interest, have been paid. Q. Mr. Argo delivered to you some stock of the H. A. Daggett Company as security, did he not? A. These notes as they fell due and I was unable to collect, I was able to use as collateral for a while, but they being refused so many times, they soon lost any value they might have at the bank, and I told Mr. Argo that I would not push him in any way, and if he was not able to make any payments, I would renew the notes, but the bank refused to accept them as collateral, then he said he would give me some additional security. The stock in a short time was not worth the paper it was written on, as the concern went out of business."

In the letter relied upon the new notes referred to are called *renewal* notes. The fact that the original notes were not taken up but left in the possession of W. R. Pharr is a strong circumstance tending to support the theory that the new notes were not intended as payment of the old notes. Another strong circumstance tending to support the theory that the new notes were not given in satisfaction of the old notes is that it would be unreasonable for one to accept unsecured notes in payment of secured notes.

After a careful reading of the record we are unable to say that the finding of the chancellor to the effect that the new notes were not given in liquidation of the original or secured notes is contrary to a clear preponderance

of the evidence.   The governing rule of law is that, without an agreement to that effect, the renewal of a note will not operate as a payment of the original note.   *Griffin* v. *Long,* 96 Ark. 272, 131 S. W. 672, 35 L. R. A. (N. S.) 855, Ann. Cas. 1912B, 622; *First National Bank of Helena* v. *Solomon,* 170 Ark. 555, 280 S. W. 659.

Appellant's next contention for a reversal of the decree is that the appellees estopped themselves from setting up any claim against appellant, Fayette R. Plumb, Inc., by allowing it and its predecessors to remove the timber without objection by providing in the timber deed that the timber should be removed and the land turned back from time to time for agricultural purposes, before the maturity of the lien notes.   A lien was retained in the deed upon the timber for the purchase money, and it was the duty of those removing the timber to pay the purchase money or to reserve enough out of the proceeds to satisfy the lien.   Leniency on the part of appellees in the collection of the purchase money did not and could not have the effect of relieving the parties who removed the timber from paying the purchase money therefor.   The timber deed was on record, and the appellants had constructive notice of the existence of the lien.   None of them were innocent purchasers.   There is nothing in the record tending to show that appellees induced appellants to buy the timber on representation that they had waived or released their claim to the purchase money therefor.

Appellant's last contention for a reversal of the decree is that the testimony fails to show that appellant, Fayette R. Plumb, Inc., cut and removed as much as $4,000 worth of timber off the land.   Said appellant put up a mill on the property and cut and removed the hickory timber off the land for two or three years.   The testimony reveals that they paid $15,000 for hickory timber on this tract and an adjoining tract of about the same size, and that there was about the same amount of hickory timber on each tract.   The logical inference is that appellant cut and removed practically all of the hickory timber off the land, for which it paid $7,500 in the tree.

No error appearing, the decree is affirmed.